UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DAVID JOHNSON,                    :
                                  :
                Plaintiff         :    No. 4:09-CV-02228
                                  :
        vs.                       :    (Judge Nealon)
                                  :
CAROLYN W. COLVIN,[1] ACTING      :
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
                Defendant         :

**FILED
SCRANTON**

DEC 3 0 2014

PER _____
DEPUTY CLERK

**MEMORANDUM**

On November 12, 2009, Plaintiff, David Johnson, filed this
appeal[2] under 42 U.S.C. § 405 for review of the decision of the
Commissioner of the Social Security Administration ("SSA")
denying his claim for social security disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. §§ 400-403.  The parties have fully briefed the appeal.
For the reasons set forth below, the decision of the Commissioner
denying Plaintiff's application for DIB will be affirmed.

_____

1.   Carolyn W. Colvin became the Acting Commissioner of the
Social Security Administration ("SSA") on February 14, 2013, and
is substituted for Michael J. Astrue as the Defendant in this
case pursuant to Federal Rule of Civil Procedure 25(d).

2.   Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D. Pa. Local Rule 83.40.1.

**BACKGROUND**

Plaintiff protectively filed[3] his application for DIB on July 26, 2007.  Tr. 11, 68, 379, 410.[4]  Plaintiff initially alleged that he became disabled on February 26, 2003, because of low back and right leg pain but subsequently amended the alleged disability onset date to February 1, 2006.  Tr. 13, 55, 355, 364, 370, 415.  Consequently, the relevant time period for review of this matter is February 1, 2006, through March 31, 2008, the date Plaintiff's insured status expired.

Plaintiff's application was initially denied by the Bureau of Disability Determination ("BDD") on December 26, 2007.[5]  Tr. 11, 112-115.  On February 11, 2008, Plaintiff requested a hearing before an administrative law judge.  Tr. 11, 116.  After over thirteen (13) months elapsed, a hearing was held before administrative law judge Elizabeth Koennecke ("ALJ") on March 23, 2009.  Tr. 146-159.  Because Plaintiff appeared at that hearing without counsel it was adjourned to allow him to obtain counsel.

---

3.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  References to "Tr.__" are to pages of the administrative record filed by Defendant as part of the Answer on May 21, 2014.  (Doc. 12).

5.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Id.  A second hearing before the same ALJ was held on July 30,
2009, at which time Plaintiff was represented by counsel.  Tr.
185-207.  The ALJ, in a decision dated August 12, 2009, found
that Plaintiff through his date last insured suffered from the
severe impairment of degenerative disc disease of the lumbosacral
spine with right-sided radiculopathy,[6] but Plaintiff still had

---

6.
Discogenic disease or degenerative disc disease is disease or
degeneration of the intervertebral discs.  The intervertebral
discs, the soft cushions between 24 of the bony vertebral bodies,
have a tough outer layer and an inner core composed of a gelatin-
like substance, the nucleus pulposus. The outer layer of an
intervertebral disc is called the annulus fibrosus. A bulge
(protrusion) is where the annulus of the disc extends beyond the
perimeter of the vertebral bodies. A herniation is where the
nucleus pulposus goes beyond its normal boundary into the annulus
and presses the annulus outward or ruptures the annulus. Such
bulges(protrusions) and herniations if they contact nerve tissue
can cause pain.  Degenerative disc disease (discogenic disease)
has been described as follows:

>   As we age, the water and protein content of the
>   cartilage of the body changes. This change results
>   in weaker, more fragile and thin cartilage.
>   Because both the discs and the joints that stack
>   the vertebrae (facet joints) are partly composed
>   of cartilage, these areas are subject to wear and
>   tear over time (degenerative changes). The gradual
>   deterioration of the disc between the vertebrae is
>   referred to as degenerative disc disease. . . Wear
>   of the facet cartilage and the bony changes of the
>   adjacent joint is referred to as degenerative
>   facet joint disease or osteoarthritis of the
>   spine. Trauma injury to the spine can also lead to
>   degenerative disc disease.
>
>   Degeneration of the disc and its contents is
>   medically referred to as spondylosis. Spondylosis
>   can be noted on x-ray tests or MRI scanning of the
>   spine as a narrowing of the normal "disc space"
>   between the adjacent vertebrae.

(continued...)

the residual functional capacity to engage in a limited range of

---

6.   (...continued)
Degeneration of the disc tissue makes the disc
more susceptible to herniation. Degeneration of
the disc can cause local pain in the affected
area. Any level of the spine can be affected by
disc degeneration. When disc degeneration affects
the spine of the neck, it is referred to as
cervical disc disease. When the mid-back is
affected, the condition is referred to as thoracic
disc disease. Disc degeneration that affects the
lumbar spine can cause chronic low back pain
(referred to as  lumbago) or irritation of a
spinal nerve to cause pain
radiating down the leg (sciatica). Lumbago causes
pain localized to the low back and is common in
older people. Degenerative arthritis
(osteoarthritis) of the facet joints is also a
cause of localized lumbar pain that can be
detected with plain x-ray testing is also a cause
of localized lumbar pain.  The pain from
degenerative disc disease of the spine is usually
treated conservatively with intermittent heat,
rest, rehabilitative exercises, and medications to
relieve pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and
Sciatica, MedicineNet.com, http://www.medicinenet.
com/degenerativedisc/page2.htm (Last accessed December 4, 2014).
Degenerative disc disease is considered part of the normal aging
process. Id.

     Radiculopathy is a condition where one or more nerves or
nerve roots are affected and do not work properly. The nerve
roots are branches of the spinal cord.  They carry signals to the
rest of the body at each level along the spine. Radiculopathy is
a result of disc herniation or an injury causing foraminal
impingement of an exiting nerve (the narrowing of the channel
through which a nerve root passes). See, generally,
Radiculopathy, MedicineNet.com,
http://www.medicinenet.com/radiculopathy/article.htm (Last
accessed December 4, 2014).  A herniated disc is one cause of
radiculopathy. Id.  Radiculopathy is a step beyond degenerative
disc disease and severe cases may requires surgical intervention.
Id.  However, "the majority of patients respond well to
conservative treatment options." Id.

4

light work.[7]  Tr. 75.   The limitations imposed by the ALJ

---

7.  The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) *Sedentary work*. Sedentary work involves
> lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like
> docket files, ledgers, and small tools.  Although
> a sedentary job is defined as one which involves
> sitting, a certain amount of walking and standing
> is often necessary in carrying out job duties.
> Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria
> are met.

> (b) *Light work*.  Light work involves lifting no
> more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10
> pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires
> a good deal of walking or standing, or when it
> involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide
> range of light work, you must have the ability to
> do substantially all of these activities.  If
> someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of
> time.

> (c) *Medium work*.  Medium work involves lifting no
> more than 50 pounds at a time with frequent
> lifting or carrying of objects weighing up to 25
> pounds.  If someone can do medium work, we
> determine that he or she can do sedentary and
> light work.

> (d) *Heavy work*.  Heavy work involves lifting no
> more than 100 pounds at a time with frequent
> lifting or carrying of objects weighing up to 50
> pounds. If someone can do heavy work, we determine
> that he or she can also do medium, light, and
> sedentary work.

(continued...)

included a prohibition on Plaintiff climbing ramps, ladders, or scaffolds, and a restriction of only occasional stooping and crawling. Id. Although Plaintiff testified at the hearing, a vocational expert did not testify or submit evidence regarding jobs Plaintiff could perform in light of the residual functional capacity set by the ALJ. Id. The ALJ merely relied on Medical-Vocational Rule 202.21 and stated that "the additional limitations had little or no effect on the occupational base of unskilled light work."[8] Tr. 77.

On August 24, 2009, Plaintiff filed a request for review with the Appeals Council, and on October 30, 2009, the Appeals

---

7.  (...continued)
        20 C.F.R. § 404.1567.

8.  Contained within the Social Security regulations are grids or tables which list Rules 201.01 through 201.29 (for sedentary work), 202.01 through 202.22 (for light work) and 203.01 through 203.31 (for medium work) in the left hand column. These grids or tables are found at 20 C.F.R., Pt. 404, Subpt. P, App. 2. The Social Security regulations provide that "where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Rule 200.00. In the right hand column of the grid or table is set forth the "Decision" as to whether a claimant is "disabled" or "not disabled. To apply the grids to deny benefits, the individual must be able to perform the full-range of exertional demands of a particular category of work and have no non-exertional limitations. Social Security Ruling (SSR) 83-12 provides, however, that where a functional limitation is "so slight that it would clearly have little effect on the occupational base" the administrative law judge can rely on the Medical-Vocational Rules. This exception only applies where the extent of erosion of the occupation base is clear and where it is not clear the administrative law judge will have to consult a vocational resource, such as a vocational expert.

Council concluded that there was no basis upon which to grant Plaintiff's request.  Tr. 79-84, 208, 213-215.

Plaintiff then filed a complaint in this court on November 12, 2009.  On January 19, 2010, the Commissioner filed a motion to remand the case for further proceedings, and the court granted that motion.

After the case was remanded, the Appeals Council on February 25, 2010, assigned the case to a different administrative law judge.  Tr. 209-210.  On December 20, 2010, the administrative law judge held a hearing by video-conference at which Plaintiff, Plaintiff's wife, and a vocational expert testified. Tr. 257-299. Plaintiff was represented by counsel.  Id.

The administrative law judge on January 21, 2011, issued a decision denying Plaintiff's application for benefits.  Tr. 95-106.  The administrative law judge found that Plaintiff, through his date last insured,[9] suffered from the severe impairment of degenerative disc disease of the lumbosacral spine with right-sided radiculopathy, but he still had the residual functional capacity to engage in a limited range of unskilled, sedentary work.  Tr. 99, 104-105.

On January 26, 2011, Plaintiff filed a request for review with the Appeals Council.  Tr. 311-315.  On August 15, 2012, the Appeals Council remanded the case to the administrative law judge

_____

9.  The administrative law judge stated that the date last insured was December 31, 2007. Tr. 72 and 74.

7

for clarification of: (1) whether or not the medical notes and opinion of a physician assistant were approved by a supervising physician; and (2) whether or not the vocational expert's identification of the semi-skilled, sedentary position of food checker was one which Plaintiff could perform.  Tr. 109-110.  The Appeals Council also directed, <u>inter</u> <u>alia</u>, that the administrative law judge "[o]btain evidence from a medical expert to clarify the nature, severity and effects of the claimant's impairments prior to his date last insured."  Tr. 110.

On August 28, 2012, the administrative law judge sent a letter to Plaintiff's counsel advising him that she expected counsel to "take action in accordance with the Order issued by the Appeals Council [on August 15, 2012]."  Tr. 318.  She further directed counsel to contact Khalid Sethi, M.D., a treating physician, to clarify the dates Dr. Sethi personally examined Plaintiff as well as "to review all of the treatment records" and "submit an assessment of [Plaintiff's] residual functional capacity based on objective evidence contained in those records." <u>Id.</u>

On September 20, 2012, the Office of Disability Adjudication and Review of the Social Security Administration requested that Louis A. Fuchs, M.D., provide an opinion with respect to Plaintiff's disability claim.  Tr. 723.  On October 22, 2012, Dr. Fuchs submitted to the Office of Disability Adjudication and Review documents entitled "Medical Interrogatory Physical

8

Impairment(s) - Adults" and "Medical Source Statement of Ability
to Do Work-Related Activities (Physical)." Tr. 741-748. On
February 26, 2013, the administrative law judge held a hearing at
which the documents completed by Dr. Fuchs were admitted into
evidence. Tr. 42-65. Also, Plaintiff and a vocational expert
testified at that hearing. Id. The testimony from the
vocational expert was provided telephonically. Id. In addition
written statements were submitted by Plaintiff's wife and three
daughters and admitted into evidence. Tr. 464-465, 467-468, 471-
475, 477-478. The written statements corroborate Plaintiff's
testimony that he has difficulty sitting, standing and walking
for any length of time and that he frequently needs to rest
during the day in a prone position. Id. The statements from
Plaintiff's wife and three daughters were all dated and signed
well-over two years after Plaintiff's date last insured. Id.

On March 11, 2013, the administrative law judge issued a
decision denying Plaintiff's application for benefits. Tr. 11-
25. The administrative law judge found that Plaintiff through
his date last insured suffered from the severe impairment of
degenerative disc disease of the lumbosacral spine with right-
sided radiculopathy but he still had the residual functional
capacity to engage in a limited range of unskilled to semi-
skilled, sedentary work. Tr. 16, 24.

On March 22, 2013, Plaintiff filed a request for review with
the Appeals Council, and on August 30, 2013, the Appeals Council

concluded that their was no basis upon which to grant Plaintiff's request. Tr. 1-3, 5-7. In so finding the Appeals Council stated in pertinent part as follows:

> The remand order of August 15, 2012, directed the Administrative Law Judge to reconsider the assessment from [a physician assistant]; clarify the date [Dr. Sethi] last examined the claimant and obtain an assessment from Dr. Sethi; give further consideration to the maximum residual functional capacity; request more information and clarification from treating sources; obtain evidence from a medical expert and obtain evidence from a vocational expert. The Administrative Law Judge's March 11, 2013 decision complied with the directives stated above.

Tr. 1. The Appeals Council further reviewed Plaintiff's exceptions to the administrative law judge's decision and found that they were without merit, including his claim that the administrative law judge erred by: (1) permitting the vocation expert to testify telephonically; and (2) failing to require the medical expert to appear at the administrative hearing and be subjected to cross-examination. Id. The Appeals Council advised Plaintiff that the administrative law judge's decision was the final decision of the Commissioner, and that a certified copy of the administrative record would be sent to the United States Attorney's Office to be filed with the district court and that if he had any questions about the case, he should contact the district court. Tr. 2.

On March 20, 2014, Plaintiff filed a motion to reopen the case which was concurred in by the Commissioner. The court granted that motion and directed the Commissioner to file the

administrative record within 60 days. After the record was filed
supporting and opposing briefs were submitted and the appeal
became ripe for disposition on September 5, 2014, when Plaintiff
filed a reply brief.

Plaintiff, who was born on August 6, 1960,[10] graduated from
high school in 1978 and can read, write, speak and understand the
English language and perform basic mathematical functions such as
paying bills, counting change, handling a savings account and
using a checkbook and money orders. Tr. 192, 370-372, 420, 425.
During his elementary and secondary schooling, Plaintiff attended
regular education classes. Tr. 420. After graduating from high
school, Plaintiff did not complete "any type of specialized job
training, trade or vocational school." Id.

Plaintiff has past relevant employment[11] as a heavy
equipment operator which was described by a vocational expert as
skilled, medium work, as generally performed in the economy, but

---

10. On Plaintiff's date last insured, he was forty-seven (47)
years of age and considered a "younger individual" whose age
would not seriously impact his ability to adjust to other work.
20 C.F.R. § 404.1563(c). The Social Security regulations state
that "[t]he term younger individual is used to denote an
individual 18 through 49." 20 C.F.R., Part 404, Subpart P,
Appendix 2, § 201(h)(1).

11. Past relevant employment in the present case means work
performed by Plaintiff during the 15 years prior to the date his
claim for disability was adjudicated by the Commissioner. 20
C.F.R. §§ 404.1560 and 404.1565.

light to heavy work as actually performed by Plaintiff. Tr. 52-
54.

Plaintiff's work history covers twenty-nine (29) years and
at least twelve (12) different employers.  Tr. 376, 387-393.  The
records of the SSA reveal that Plaintiff had earnings in the
years 1976 through 2002, 2008 and 2009.  Tr. 393. Plaintiff's
annual earnings range from a low of one hundred dollars ($100.00)
in 1976 to a high of sixty-nine thousand six hundred thirty-seven
dollars and sixty-eight cents ($69,637.68) in 2001.  Id.
Plaintiff's total earnings during those twenty-nine (29) years
were nine hundred twenty-two thousand six hundred seventy-three
dollars and fifty-nine cents ($922,673.59).  Id.  Plaintiff's
last employment was in 2008 and 2009 when he worked for a short
period of time for the United Parcel Service earning one thousand
fifty-one dollars and ninety-eight cents ($1051.98) and two
hundred sixty-seven dollars and seven cents ($267.07),
respectively.  Tr. 390.  This employment did not amount to
substantial gainful activity, and the administrative law judge
found that Plaintiff had not engaged in any substantial gainful
activity during the period from his amended alleged onset date of
February 1, 2006 through his date last insured of March 31, 2008.
Tr. 16.

**MEDICAL RECORDS**

Before the court addresses the administrative law judge's decision and the arguments of counsel, the court will review in detail some of Plaintiff's medical records.  The court will focus primarily on the medical records from the relevant time period but will review some records which predate his amended alleged onset date of February 1, 2006, which shed light on his condition.

As stated above, Plaintiff contends that he is disabled because of low back and right leg pain.  The impetus for his disability is not specified other than Plaintiff, at the administrative hearing held on December 20, 2010, suggested that he suffered a work-related back injury as the result of "bouncing up and down in the equipment" within a three-year period prior to 2002.  Tr. 263.

The first medical records the court encounters are two (2) brief treatment notes from Glendon C. Summers, D.C., a chiropractor, dated July 11 and August 28, 1999.[12]  Tr. 627.  At

---

12.  A chiropractor is not an "acceptable medical source" under the Social Security regulations "to establish whether [a claimant] has a medically determinable impairment." 20 C.F.R. § 404.1513(a).  A chiropractor may be considered an "other source[]" to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d). A review of Dr. Summers's treatment record from before April 1, 2008, the day after Plaintiff's date last
(continued...)

13

the appointment with Dr. Summers on July 11, 1999,[13] Plaintiff
reported "upper back soreness," his "pain increases when he takes
a deep breath," and that he had "some [] chest pain." <u>Id.</u>  The
only objective observation made by Dr. Summers was that Plaintiff
had "[t]aut and tender fibers along the thoracic spine."[14]  <u>Id.</u>
The appointment on August 28, 1999, was to apparently review x-
rays of Plaintiff's cervical spine. <u>Id.</u>  Dr. Summers reported
that Plaintiff had "[t]ender fibers [] along the cervical spine,
C4 through C6" and that the "x-rays reveal[ed] a loss of cervical
lordosis."[15]  <u>Id.</u>  At both of these appointments, Dr. Summers
manipulated (adjusted)Plaintiff's spine.  <u>Id.</u>  Furthermore, on
both occasions, he indicated that Plaintiff had "segmental
dysfunction," which is a term used by chiropractors to describe a
misalignment or subluxation of a vertebra.  <u>Id.</u>

---

12. (...continued)
insured, do not reveal an assessment of Plaintiff's work-related
functional ability, including his ability to sit, stand, walk,
and lift or carry items.

13. In 1999, Plaintiff was working as a heavy equipment operator
and earned $60,358.09; in 2000 he earned $35,281.57; and in 2001
he earned $69,637. Tr. 393.

14. In other words, Plaintiff had stiff, tense or tigtly drawn
muscles along each side of the thoracic spine which were tender
to touch.

15. Lordosis refers to the normal curvature of the spine.

On January 9, 2002, Plaintiff had an MRI of his lumbar spine
performed at Northeastern Pennsylvania MRI Imaging Center.  Tr.
675.  The MRI revealed that Plaintiff had "good alignment of the
lumbar spine; the vertebral body heights were within normal
limits; and there were no fractures or dislocations.  Id.  The
only significant findings were degenerative disc disease at the
L4-L5 level and the L5-S1 level represented by a small disc
protrusion, diffuse disc bulging, disc space narrowing and slight
to mild neural foramina narrowing bilaterally, and a
"[m]oderately large central and right paracentral disc extrusion
[at the] L5-S1 level with significant narrowing of the proximal
aspect of the right lateral recess at this level and possibly
compressing the right S1 nerve root."  Id. Plaintiff had no
significant spinal canal stenosis.  Id.

On February 7, 2003, Plaintiff had an appointment with Ihab
A. Dana, M.D., of Endless Mountain Health System. Tr. 484. Dr.
Dana's notes of this appointment are only partially legible.  Id.
The court can discern that Plaintiff was complaining of pain in
his right lower extremity.  Id.  Plaintiff stated the onset of
his condition was in November, 2001, but he could not point to
any specific injury suffered although at that time he was
operating heavy equipment and his job was to perform demolition.
Id.  Plaintiff reported that a prior physician had suggested
surgery but no surgical consultation was performed under the

15

prior physician's care.  Id.  Plaintiff also reported that he suffered from a burning sensation in his right lumbar region and that his right ankle would ache but that he had no numbness or loss of ankle power.  Id.  Dr. Dana's diagnostic assessment was "disc syn[drome]" and he recommended a consultation with a neurosurgeon.  Id.

On March 4, 2003, Plaintiff had a follow-up appointment with Dr. Dana at which it was noted that Plaintiff was having "a problem with back pain [] for several years" and was previously seen at Dr. Dana's office for a "disability physical."[16]  Id.  The results of a physical examination of Plaintiff performed by Dr. Dana were essentially normal.  Id.  Plaintiff was in no acute distress; his extremities were normal; neurologically he was alert and oriented with no focal deficits; and his motor and sensory function and reflexes were normal.  Id.  The only adverse findings were that he had tenderness in the paraspinal muscles and a positive straight leg raising test on the right at 45 degrees.[17]  Id.  Dr. Dana's diagnostic assessment was that

---

16.  The medical notes of this appointment are typewritten.

17.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated

(continued...)

Plaintiff suffered from a herniated disc, and noted that
Plaintiff was disabled for 6 months.  Id.  Dr. Dana did not
provide an assessment of Plaintiff's work-related functional
ability, including his ability to sit, stand, walk, and lift or
carry items.  Id.

On March 31, 2003, Plaintiff was examined by Khalid Sethi,
M.D., a neurosurgeon, with Southern New York Neurosurgical Group,
P.C.  Tr. 494-496.  During the appointment Plaintiff complained
of low back pain which was "tolerable" and pain which involved
the right buttock which radiated down the right leg.  Id.
Plaintiff denied "any precipitating event," but reported that the
symptoms commenced in November of 2001.  Id.  Plaintiff denied
abusing alcohol, but stated that he smokes one and a half (1 ½)
packs of cigarettes per day and that he has done so for twenty-
five (25) years.  Id.  Plaintiff denied any weakness in his legs
but reported numbness and tingling "predominantly along the right
leg."  Id. Plaintiff stated that he was receiving chiropractic
treatments and that his "symptom complex [had] remained
manageable."  Id.  He further noted that he had seen a physician
who had advised him to have surgery and he was seeking a second
opinion.  Id.  The results of a physical examination were
essentially normal, including normal muscle strength throughout

17.  (...continued)
-discs-straight-leg-raise (Last accessed December 5, 2014).

and a reasonable range of motion of the spine.  Tr. 495.  The
only adverse physical examination findings were that he had "some
very mild hypesthesia[18] and hypalgesia[19] in the right S1
dermatomal distribution"[20] and a positive straight leg raise test
on the right at thirty-five (35) to forty (40) degrees.  Id.  Dr.
Sethi's diagnostic assessment was that Plaintiff suffered from:
(1) lumbar spondylosis with spondylitic arthropathy;[21] (2) mild
degenerative disc disease; (3) a herniated nucleus pulposus at
the L5-S1 level; and (4) a right S1 radiculopathy.  Id.  Dr.
Sethi noted that Plaintiff's low back pain was primarily related
to his spondylitic disease (arthritis) and should be managed
conservatively.  Tr. 496.  Dr. Sethi further opined that
Plaintiff's leg pain was an S1 radiculopathy and "accounted for

---

18.  Hypesthesia is a reduced sense of touch or sensation, that
is numbness.

19.  Hypalgesia is a decreased sensitivity to painful stimuli.

20.  A dermatome is an area of the skin mainly supplied by a
single spinal nerve, There are 8 such cervical nerves, 12
thoracic, 5 lumbar and 5 sacral. A problem with a particular
nerve root should correspond with a sensory defect, muscle
weakness, etc., at the appropriate dermatome. See Stephen
Kishner, M.D., Dermatones Anatomy, Medscape Reference,
http://emedicine.medscape.com/article/1878388-overview
(Last accessed December 5, 2014).

21.  Degeneration of the vertebrae and intervertebral discs is
medically referred to as spondylosis. Spondylosis can be noted on
x-ray tests or MRI scanning of the spine as a narrowing of the
normal "disc space" between the adjacent vertebrae. The term is
frequently used to describe osteoarthritis of the spine.

by his herniated nucleus pulposus at the L5-S1 level." Id. Dr.
Sethi stated that the radiculopathy was "recalcitrant to
conservative measures" but that Plaintiff had not exhibited any
"myotomal[22] [muscular] weakness on examination per se." Id. Dr.
Sethi advised Plaintiff that a surgical decompression was a
reasonable option but Plaintiff opted for conservative treatment
and Dr. Sethi referred him to physical therapy. Id.

On August 15, 2003, Plaintiff had a follow-up appointment
with Dr. Sethi at which Plaintiff reported back pain and
"occasional pain down the right leg" but that his "symptoms
[were] quite tolerable." Tr. 493. A physical examination
revealed that Plaintiff had no muscle weakness; he could walk on
his heels and toes;[23] he had a negative straight leg raise test;
and his lumbar range of motion was "reasonable." Id. Dr.
Sethi's diagnostic assessment was that Plaintiff suffered from
mild lumbar spondylosis with spondylitic arthropathy and a right
S1 radicular syndrome which was resolving. Id. Plaintiff asked

---

22. A myotome is a group of muscles supplied by a single nerve
root.

23. The heel walk test requires the patient to walk on his
heels. The inability to do so suggests L4-5 nerve root
irritation. The toe walk test requires the patient to walk on his
toes. The inability to do so suggests L5-S1 nerve root
irritation. Clinical Examination Terminology, MLS Group of
Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/
Clinical%20Examination%20Terminology.html (Last accessed December
7, 2014).

Dr. Sethi if he could return to work, and Dr. Sethi responded by stating that the best way to answer that question was "with a Functional Capacity Evaluation to delineate the extent of disability if any." Id.

On January 16 and February 4, 2004, Plaintiff had appointments with Jennifer Button-Weller, D.C., a chiropractor. Tr. 485. The notes of these two (2) appointments provide no insight into Plaintiff's ability to function on a full-time capacity in a work setting. Id. At the appointment on January 16th Plaintiff reported "slight" low back pain and right posterior thigh and leg pain. Id.

On February 4, 2004, Plaintiff reported low back pain with slight pain going into the right extremity, including the thigh, calf, and ankle. Id. On January 16, 2004, Dr. Button-Weller reported tenderness in the right sacroiliac region of Plaintiff's spine, muscular spasm in the lumbar spine, and "fixations" at the L4-L5 level of the lumbar spine.[24] Id. She noted tenderness at the L5 level.[25] Id. At both of these appointments, Dr. Button-Weller manipulated (adjusted) Plaintiff's spine. Id.

---

24. "Fixation" is a chiropractic term denoting an area of hypomobility or reduced movement. It is sometimes used to refer to a dislocation (subluxation) or misalignment of a vertebra.

25. The form on which the treatment notes are recorded indicates that tenderness is specified by placing a circle around the level of the spine.

In 2004, Plaintiff had four (4) chiropractic appointments with Dr. Summers on March 18, June 17, July 24 and September 4. Tr. 626-627.  On March 18, 2004, the only objective observations recorded by Dr. Summers were that Plaintiff's left lateral lumbar flexion was twenty (20) degrees (normal being twenty-five (25) degrees); his right lateral lumbar flexion was forty (40) degrees (normal being twenty-five (25) degrees); his lumbar flexion was forty-five (45) degrees (normal being sixty (60) degrees); his lumbar extension was twenty (20) degrees (normal being twenty (20) degrees);[26] and he had a positive straight leg raise test on the right at seventy (70) degrees. Tr. 627.  However, the Bragard sign or test was negative suggesting that the pain elicited at seventy (70) degrees was muscular in origin.[27]  Id. At the appointment on June 17, 2004, Dr. Summers's only objective observation was that Plaintiff had "taut and tender fibers []  along the sacrum" and on July 24, 2004 and September 4, 2004, the

26.  Dr. Summers subsequently reported that normal lumbar flexion is sixty (60) degrees; normal lumbar extension twenty (20) degrees; and normal left and right lumbar lateral flexion twenty-five (25) degrees.  Tr. 619.

27.  The Bragard sign is "[p]rocedure used to determine whether the source of lower back pain is nervous or muscular.  A straight leg raising procedure is done; if positive the leg is lowered just below the point of pain and then the ankle is dorsiflexed. If pain increases during dorsiflexion, pain is likely nervous in origin, whereas with no increase, the source is presumed muscular." Bragard sign, Medical Dictionary for the Health Professions and Nursing (2012), http://medical-dictionary.the freedictionary.com/Bragard+sign (Last accessed December 5, 2014).

only objective findings were that Plaintiff had "taut and tender fibers [] along the lumbar spine." Tr.  626-627.  At these four (4) appointments, Dr. Summers manipulated Plaintiff's spine.  Id. Furthermore, on three (3) occasions, he indicated that Plaintiff had "fixations" and "segmental dysfunction."  Id.

On February 2, 2005, Plaintiff had an appointment with Joseph Andusko, a physician assistant employed by Dr. Sethi.[28] Tr. 304-305.  Physician assistant Andusko reported that Plaintiff had "been followed conservatively as his symptoms [were] fairly tolerable" and that Plaintiff stated that he was "looking for work and he had some questions regarding restrictions and his ability to work."  Tr. 304.  The results of a physical examination performed by Mr. Andusko were essentially normal. Id.  Plaintiff had a normal gait and no muscular spasm in the lumbar region of the spine, and his strength, sensation, and reflexes were intact throughout the lower extremities.  Id.  The only slightly adverse finding was that Plaintiff had a positive straight leg raise test in the seated position on the right at sixty (60) degrees which "cause[d] mild discomfort[.]"  Id.  Mr. Andusko recommended that Plaintiff not return to work as a heavy

---

28.  A physician assistant is not an acceptable medical source under the regulations of the Social Security Administration. 20 C.F.R. § 404.1513(a) and (d). Mr. Andusko was an "other source" under the regulations "to show the severity of [the] impairment(s) and how it affects [the individual's] ability to work." Id.

equipment operator or to work which required heavy lifting, twisting or bending.  Id.  Mr. Andusko further stated that Plaintiff would be able to work in a job requiring little lifting and which allowed him to change positions frequently.  Id.  Mr. Andusko told Plaintiff that if he needed "more specific details regarding his work abilities, then [a] Functional Capacity Evaluation would be required."  Tr. 304-305.  Dr. Sethi did not examine Plaintiff on February 2, 2005.  Tr. 303.

In 2005, Plaintiff had twenty-five (25) chiropractic appointments with Dr. Summers (March 24; May 5, 27, and 31; June 2, and 30; July 16, 18, 23, 25, and 30; August 1, 2, and 9; September 6, 12, 15, and 20; October 3 and 17; November 3, 11, and 19; and December 2 and 13).  Tr. 623-626.  At each of these appointments, Dr. Summers' only objective observations were that Plaintiff had "taut and tender fibers [] along the lumbar spine" and indicated that Plaintiff had "fixations" and "segmental dysfunction."  Id.  Dr. Summers manipulated Plaintiff's spine. Id.

In 2006, Plaintiff had seven (7) chiropractic appointments with Dr. Summers (January 20; February 25; March 6 and 10; June 8; and July 7 and 17).  Tr. 622-623.  At four (4) of these appointments, Dr. Summers's only objective observation was that Plaintiff had "taut and tender fibers [] along the lumbar spine;" at two (2) appointments, the only objection observation was that

Plaintiff had "taut and tender fibers [] along the thoracic and lumbar spine;" and at one (1) appointment, the only objective observation was that Plaintiff had "taut and tender fibers [] along the cervical and lumbar spine." Id. At each appointment, it was reported that Plaintiff had "fixations" and "segmental dysfunction." Id. Dr. Summers manipulated Plaintiff's spine. Id.

In 2007, Plaintiff had four (4) appointments with Dr. Summers (April 14; and May 11, 15 and 22). Tr. 621-622. At each of these appointments, Dr. Summers found that Plaintiff had "taut and tender fibers [] along the lumbar spine." Id. On one occasion, Dr. Summers also found that Plaintiff had "taut and tender fibers" along the pelvis. Id. At each appointment, it was reported that Plaintiff had "fixations" and "segmental dysfunction." Id. Dr. Summers manipulated Plaintiff's spine. Id.

On August 15, 2007, Plaintiff had an appointment with Christine Snyder, a physician assistant, employed by Dr. Sethi. Tr. 490. Ms. Snyder noted that Plaintiff had been last seen in 2005. Id. Plaintiff reported that his condition had "waxed and waned" but "never completely got better." Id. He further reported that his leg pain had worsened in the last several months, and that he had taken the nonsteroidal anti-inflammatory drug Bextra in the past with some relief, but was presently

24

taking no medications.  Id.  A physical examination revealed that Plaintiff was alert and in no acute distress; his lumbar region revealed no obvious deformity and he had no tenderness through the midline of the spine; he had some mild right-sided sciatic tenderness; his straight leg raise test was positive on the right at 80 degrees[29] and negative on the left; he had full strength in the lower extremities; his reflexes were normal; he had diminished sensation in the right S1 dermatome distribution; his speech was normal; and he was able to walk on his heels and toes. Id.  Ms. Snyder noted that Plaintiff was reluctant to consider any surgical options and elected not to have any re-imaging of his spine.  Id.  Plaintiff was referred to physical therapy and prescribed a Decadron tapper[30] and the nonsteroidal anti-inflammatory drug Naprosyn (Aleve).  Id.

On August 28, 2007, Plaintiff commenced physical therapy at Barnes-Kasson Hospital, Susquehanna, Pennsylvania.  Tr. 497-499. From that date through October 17, 2007, Plaintiff had twenty

---

29.  Pain at greater than 70 degrees suggests a number of conditions other than a herniated disc, including tightness of the hamstrings or "a pathology of the hip or sacroiliac joint." Straight Leg Raise Test, Physiopedia, http://www.physio-pedia.com /Straight_Leg_Raise_Test (Last accessed December 7, 2014).

30.  "Decadron . . . is a corticosteroid. It works by decreasing or preventing tissues from responding to inflammation." Decadron Dose Pack tablets (dose pack), Drugs.com, http://www.drugs.com/cdi/decadron-dose-pack-tablets-dose-pack.htm l (Last accessed December 7, 2014).

(20) physical therapy appointments, and missed three (3).  Tr.
499-506.  A physical therapy discharge note dated November 16,
2007, reveals that physical therapy resulted in Plaintiff gaining
"significant increase of strength" and he "perform[ed] all
exercises as per repetitions without any weakness in his lumbar
spine."  Tr. 507.  It was further reported that Plaintiff "had
full lumbar [range of motion]."  Id.

On December 21, 2007, Frederick B. Myers, M.D., reviewed
Plaintiff's medical records on behalf of the BDD, and concluded
that Plaintiff suffered from degenerative disc disease at the L5-
S1 level of the spine with a herniated nucleus pulposus and a
right-sided S1 radiculopathy but that he still had the ability to
engage in a limited range of medium work.  Tr. 68, 515-520.  Dr.
Myers found that Plaintiff could occasionally lift and/or carry
fifty (50) pounds; he could frequently lift and/or carry twenty-
five (25) pounds; he could stand and/or walk six (6) hours in an
8-hour workday; he could sit about six (6) hours in an 8-hour
workday; he had an unlimited ability to push and pull, including
operating hand and foot controls, other than as shown for lifting
and/or carrying; he could occasionally use ramps, climb ropes and
scaffolds; he could frequently climb stairs and ladders; he could
frequently balance, kneel, crouch and crawl; he could
occasionally stoop; and he had no manipulative, visual,
communicative or environmental limitations.  Id.

The only remaining medical records from the relevant time
period (i.e., February 1, 2006, to March 31, 2008, Plaintiff's
date last insured) are from "Dr. P. Patel" consisting of two (2)
pages of patient progress notes date February 7 and 21, 2008.
Tr. 530 and 532-533.  The progress notes are mostly illegible,
and there is no indication of any objective examination findings
other than possibly some tenderness along the lumbosacral spine
and a positive straight leg raise test.  Id.

More than a year after the date last insured, Plaintiff was
examined on one occasion by Irwin Rosenberg, M.D., at the request
of Plaintiff's attorney.  Tr. 525-526.  The examination was
performed at Dr. Rosenberg's office in Endicott, New York, on May
29, 2009.  Id.  Plaintiff appeared at the appointment
unaccompanied and was "pleasant and cooperative throughout."  Id.
Dr. Rosenberg states in his report of the examination that prior
to it he reviewed Plaintiff's medical records, including the
records of Dr. Sethi and the MRI results.  Id.  After conducting
a clinical interview and a physical examination, Dr. Rosenberg
concluded that Plaintiff was "capable of only the most sedentary
work" and required "frequent position changes."  Tr. 526.  He
further opined that Plaintiff would suffer "frequent loss of
[work] time due to pain."  Id.  A physical examination performed
by Dr. Rosenberg revealed that Plaintiff had difficulty getting
out of a chair and ambulated with a limp; Plaintiff had "acute

27

tenderness" in the lumbar paraspinal muscles, right worse than left with marked muscular spasm; Plaintiff had extremely limited range of motion of the low back;[31] Plaintiff was able to walk on his heels but unable to stand on his toes; and Plaintiff had a positive straight leg raise test on the right at 30 degrees. Tr. 525-526.  Dr. Rosenberg stated that Plaintiff's "[d]isability dates probably to 2001, but certainly [was] well documented after February 2003."  Tr. 526.  Dr. Rosenberg did not state what findings from Plaintiff's pre-date last insured medical records supported his conclusion that  Plaintiff's disability dated to February 2003 and were consistent with his physical examination findings of May 29, 2009.  Tr. 525-526.

In a separate document also dated May 29, 2009, Dr. Rosenberg stated that Plaintiff required "complete freedom to rest frequently without restriction;" Plaintiff needed rest, including reclining or lounging, for substantial periods of time during the day; if Plaintiff attempted to work full-time at a sedentary job he would have four or more absences per month; Plaintiff suffers from moderate pain and marked fatigue; Plaintiff can sit less than six hours out of an eight hour day and needs to alternate positions; Plaintiff cannot stand for more than two hours out of an eight hour workday; Plaintiff is unable

---

31.  Dr. Rosenberg did not specify in degrees the range of motion.

to lift any amount of weight without causing excess pain or worsening of his condition; Plaintiff has a mild limitation with respect to concentration and a marked limitations with respect to pace; and Plaintiff is only taking over the counter analgesics and has no side effects. Tr. 527-529.  Dr. Rosenberg stated the limitations which he mentioned covered the period from 2001 to May 2009.  Tr. 529.

On July 21, 2009, Dr. Summers completed a document in which he set forth similar findings and conclusions.  Tr. 554-556. Dr. Summers, however, stated that Plaintiff's limitations which he mentioned covered the period from 1996[32] to July, 2009.  Tr. 556. Dr. Summers also was deposed by Plaintiff's counsel on December 27, 2010, more than two (2) years after Plaintiff's date last insured.  Tr. 658-671.  During that deposition, Dr. Summers continued to opine that Plaintiff was disabled.  Id.

On October 22, 2012, Louis A. Fuchs, M.D., an orthopedic surgeon, evaluated Plaintiff's medical records on behalf of the Social Security Administration and completed interrogatories and

---

32.  Dr. Summers's limitations are suspect, inter alia, because in 1996, 1997, 1998 and 1999, Plaintiff worked as a heavy equipment operator and earned fifty-five thousand one hundred thirteen dollars and eighty-two cents ($55,113.82), forty-six thousand five hundred twenty-four dollars and forty-two cents ($46,524.42), sixty thousand seven hundred thirty-eight dollars and twenty cents ($60,738.20), and sixty thousand three hundred fifty-eight dollars and nine cents ($60,358.09), respectively. Tr.

a medical source statement of Plaintiff's ability to perform
work-related physical activities.  Tr. 741-748.  Dr. Fuchs was
instructed that the period at issue was March 2002 through March
2008.  Tr. 741.  Dr. Fuchs, after reviewing Plaintiff's medical
records, concluded that Plaintiff had the ability to continuously
lift and/or carry up to twenty (20) pounds; he had the ability to
sit at one time without interruption four (4) hours; he could
stand at one time without interruption one (1) hour; he could
walk at one time without interruption one (1) hour; he could sit
a total of eight (8) hours in an 8-hour workday; he could stand a
total of two (2) hours in an 8-hour workday; he could walk a
total of two (2) hours in an 8-hour workday; he did not require
the use of cane to ambulate; he could continuously reach overhead
and in all directions; he could handle, finger, feel and
push/pull; he could frequently operate foot control with the
right foot and continuously with the left; he could never climb
ladders or scaffolds; he could occasionally stoop, kneel, crouch,
and crawl; he could frequently climb stairs and ramps; and he
could continuously balance.  Tr. 743-746.  Dr. Fuchs further
found that Plaintiff could tolerate exposure to unprotected
heights, moving mechanical parts and humidity and wetness on a
continuous basis; he could operate a motor vehicle on a
continuous basis; he could occasionally be exposed to extreme

30

heat; and he should never be exposed to extreme cold or vibrations. Tr. 747.

There are additional medical records, including records from Dr. Summers, which arguably suggest that Plaintiff's condition deteriorated after the date last insured. Tr. 525-529, 557-620, 629-657, 681-718, 750-781.[33]

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d

---

33. The first medical record encountered after the date last insured appears to be treatment records from Dr. Summers dated July 27, 2009. The index to the administrative record refers to 24 pages of medical evidence dated 8/1/2007 to February 7, 2009. However, a review of those 24 pages does not reveal a document dated February 7, 2009. The document is actually dated February 7, 2008, and is patient progress note from Dr. Patel. Tr. 533.

34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990). Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence." <u>Consolo v. Federal Maritime Commission</u>,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the

other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must

take into account whatever in the record fairly detracts from its

weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488

(1971). A single piece of evidence is not substantial evidence

if the Commissioner ignores countervailing evidence or fails to

resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at

1064. The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>,

642 F.2d at 706-07. Therefore, a court reviewing the decision of

the Commissioner must scrutinize the record as a whole. <u>Smith v.</u>

<u>Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v.</u>

<u>Califano</u>, 606 F.2d 403, 407 (3d Cir.

1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."   42 U.S.C. § 432(d)(1)(A).

Further,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental
> impairment or impairments are of such severity
> that he is not only unable to do his previous work
> but cannot, considering his age, education, and
> work experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.
> For purposes of the preceding sentence (with
> respect to any individual), "work which exists in
> the national economy" means work which exists in
> significant numbers either in the region where
> such individual lives or in several regions of the
> country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating

disability and claims for disability insurance benefits. See 20

C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process

requires the Commissioner to consider, in sequence, whether a

claimant (1) is engaging in substantial gainful activity, (2) has

an impairment that is severe or a combination of impairments that

is severe, (3) has an impairment or combination of impairments

that meets or equals the requirements of a listed impairment, (4)

has the residual functional capacity to return to his or her past

work and (5) if not, whether he or she can perform other work in

the national economy.  Id.  As part of step four, the

Commissioner must determine the claimant's residual functional

34

capacity.  Id.  If the claimant has the residual functional
capacity to do his or her past relevant work, the claimant is not
disabled.  Id.  "The claimant bears the ultimate burden of
establishing steps one through four."  Poulos, 474 F.3d at 92,
citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).
"At step five, the burden of proof shifts to the Social Security
Administration to show that the claimant is capable of performing
other jobs existing in significant numbers in the national
economy, considering the claimant's age, education, work
experience, and residual functional capacity. "  Id.

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis.  See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A
regular and continuing basis contemplates full-time employment
and is defined as eight hours a day, five days per week or other
similar schedule.  The residual functional capacity assessment
must include a discussion of the individual's abilities.  Id.; 20
C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1
("'Residual functional capacity' is defined as that which an
individual is still able to do despite the limitations caused by
his or her impairment(s).").

35

**ALJ DECISION**

Initially, the ALJ concluded that Claimant met the insured status requirements of the Social Security Act through December 31, 2008.  Tr. 15.  The ALJ then proceeded through each step of the sequential evaluation process and determined that Claimant is not disabled.  Tr. 15-25.

At step one, the ALJ found that Claimant had not engaged in substantial gainful work activity from his amended alleged onset date of February 1, 2006, through his date last insured, December 31, 2008.  Tr. 16.

At step two, the ALJ determined that Claimant suffered from the severe[34] combination of impairments of the following: "degenerative disc disease of the lumbosacral spine with right sided radiculopathy. (20 C.F.R. 404.1520(c))."  Tr. 16.

At step three of the sequential evaluation process, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled the listed impairments

---

34.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.   20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.   20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).   Tr. 16.

At step four, the ALJ determined that Claimant had the residual functional capacity ("RFC")  to perform a full range of sedentary work.[35]  Tr. 23-24.  Specifically, the ALJ stated the following:

> [Plaintiff] has the residual functional capacity to lift and/ or carry up to 20 pounds, stand and/ or walk for two hours each in an eight=hour workday, and sit for eight hours in an eight-hour workday with the ability to sit/stand at will.  He was able to continuously and bilaterally reach in any directions, handle, finger, feel, and push/pull.  He was able to frequently operate foot controls with his right and continuously operate foot controls with his left.  He was never able to climb ladders/ scaffolds, but was able to occasionally stoop, kneel, crouch, and crawl, frequently climb stairs/ ramps, and continuously balance.  He was never able to be exposed to extreme cold and vibrations, and was occasionally able to be exposed to extreme heat [sic].  He had no limitations associated with working around unprotected heights, moving mechanical parts,

---

35.  The Social Security regulations define sedentary work as follows:

> (a) Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a) and 416.967.

operating a motor vehicle, and exposure to
humidity.

Tr. 16

At step five of the sequential evaluation process, the ALJ
determined that there were jobs in significant numbers in the
national economy that Claimant could have performed. Tr. 24-25.

Thus, the ALJ concluded that Claimant was not under a
disability as defined in the Social Security Act at any time
between the amended alleged onset date of February 1, 2006, and
the date last insured, March 31, 2008. Tr. 25.

**DISCUSSION**

Plaintiff argues that the administrative law judge erred by:
(1) failing to appropriately consider the opinions of Dr. Summers
and Dr. Rosenberg and Mr. Andusko; (2) inappropriately accepting
the opinion of Dr. Fuchs; (3) failing to allow him to call and
cross-examine Dr. Fuchs; (4) failing to sustain the burden of
demonstrating at step five that jobs existed which Plaintiff
could perform; (5) failing to appropriately assess his
credibility; and (6) improperly using telephonic testimony of the
vocational expert. The court has thoroughly reviewed the record
in this case, and finds no merit in Plaintiff's arguments.

The Social Security regulations require that an applicant
for DIB come forward with medical evidence "showing that [the
applicant] has an impairment(s) and how severe it is during the

time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c).

No treating physician has indicated that Plaintiff, during the relevant time period, suffered from physical functional limitations which precluded him from engaging in the limited range of unskilled to semi-skilled, sedentary work set by the administrative law judge in his decision for the requisite statutory twelve (12) month period.[36]  However, there are two (2) medical opinions in the record which support the residual functional capacity set by the administrative law judge.  Dr. Myers opined that Plaintiff could engage in a limited range of medium work and Dr. Fuchs's opinion fully supports the decision of the administrative law judge.  The administrative law judge's reliance on the opinion of Dr. Myers and Dr. Fuchs was clearly appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we

---

36.  To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).  In this case the administrative law judge appropriately considered the objective medical evidence and the court is convinced that the opinions of Drs. Myers and Fuchs support the administrative law judge's decision and the rejection of the opinions of Dr. Summers and Dr. Rosenberg.  Furthermore, the court discerns nothing inappropriate in the manner in which the administrative law judge considered the opinion of Mr. Andusko, the physician assistant.

Plaintiff's contention that he had a right to cross-examine Dr. Fuchs is unsupported by any case law from this circuit or regulation of the Social Security Administration.  Dr. Fuchs's

opinion was issued in October, 2012.  Plaintiff was aware of the
opinion of Dr. Fuchs at least by February 1, 2013, and had time
prior to the administrative hearing which was held on February
26, 2013, to contact treating physicians for rebuttal evidence or
to ask for a continuance of the administrative hearing. Tr. 470.
There is no indication Plaintiff attempted to obtain rebuttal
evidence from treating physicians and although he requested that
he have the right to cross-examine Dr. Fuchs at the hearing, he
did not request a continuance of the hearing.

Plaintiff contends that under HALLEX[37] I-2-5-24 that he had
a right to cross-examine Dr. Fuchs.  Plaintiff's reliance on
HALLEX I-2-5-44 is misplaced.  That provision does not give
Plaintiff any such right and merely relates to the procedures
that must be followed when an administrative law judge receives
answers to interrogatories from a medical expert post-hearing.  A
reading of the various HALLEX provisions indicates that an
administrative law judge can prior to a hearing submit

---

37.  HALLEX is the Hearings, Appeals and Litigation Law Manual of
the Social Security Administration. It "conveys guiding
principles, procedural guidance and information to the Social
Security Office of Hearings and Appeals Staff" but "does not
carry the force and effect of law" and "lacks the administrative
formality or other attributes that would justify substantial
judicial deference."  Carolyn A. Kubitschek & Jon C. Dubin,
Social Security Disability Law and Procedure in Federal Courts,
35-36 (2014)(citing, inter alia, Bunnell v. Barnhart, 336 F.3d
1112, 1114 (9th Cir. 2003) and Power v. Barnhart, 292 F.3d 781,
786 (D.C. Cir. 2002)).

interrogatories to a medical expert and provide the answers to
the interrogatories to the claimant.[38]  It is only when the
interrogatories are submitted after a hearing that a claimant may
have a right to a supplemental hearing and right to cross-examine
the medical expert and then only if the administrative law judge
determines that supplemental interrogatories would not be
sufficient and questioning at a supplemental hearing is needed to
inquire fully into the issues. See HALLEX 1-2-7-30.

The administrative law judge properly reasoned that
obtaining an opinion from a medical expert prior to a hearing was
no different than an opinion rendered by any other medical expert
routinely considered by administrative law judges for which
cross-examination is not required, such as a consultative
examiner or the opinion of a state agency physician who merely
performs a review of a claimant's medical records during the
initial review process for the Bureau of Disability
Determination.

Moreover, the administrative law judge pointed out that the
interrogatories were made part of the record in the fall of 2012

---

38.  HALLEX I-2-5-30 provides in relevant part that "[p]rior to
[a] hearing [] an ALJ may use interrogatories if he or she
decides that personal appearance and testimony by the expert are
not essential and that interrogatories will provide a full
inquiry into the matters at issue."

and counsel would have had access to the answers to the
interrogatories and ample time to rebut them.[39]   Tr. 12.

Plaintiff's argument that the administrative law judge's
step 5 determination is not supported by substantial evidence is
based on his claim that the vocational expert did not testify to
the numbers of the specific jobs he identified - food checker,
telephone solicitor and table worker - but a broader category,
the Standard Occupational Classification ("SOC"), in which those
jobs were included.  The courts review of the testimony of the
vocational expert at the administrative hearing held on February
26, 2013, reveals that Plaintiff's argument is without merit.
The vocational expert testified that there were over one hundred
thousand (100,000) food checker positions in the national
economy, over six thousand (6,000) in the state, and one hundred
(100) locally; there were over one hundred seventy thousand
(170,000) telephone solicitor positions nationally, over eight
thousand five hundred (8,500) in the state, and one hundred
fifty-one (151) in the local economy; and there were over thirty-
four thousand (34,000) table worker positions nationally, over

---

39.  Plaintiff also inappropriately relies on Wallace v. Brown,
869 F.2d 187 (3d Cir. 1989) which was a case involving the
submission of medical records to a physician post-hearing. He
further makes a meritless argument in his reply brief that the
medical expert opinion was rendered post-hearing.  There was
never a hearing where a medical expert testified.  Consequently,
the interrogatories were not considered after a hearing under the
HALLEX provisions.

one thousand six hundred (1,600) in the state, and forty-three

(43) locally.  Tr. 56-57.  The vocational expert under cross-

examination from Plaintiff's attorney further testified regarding

the numbers he gave as follows:

> Q. Okay.  I lost my next questions.  Oh, it was
> the numbers of jobs you gave, the telephone
> solicitor, the numbers of jobs you gave, that
> would be only for that one [Dictionary of
> Occupational Titles] code, is that correct?
>
> A.  Correct, yes.
>
> Q.  That's actually the only DOT within that
> larger [Standard Occupation Classification].  For
> the other two, were the numbers of jobs unique, or
> just for those two jobs, or were they for the
> higher, or more inclusive occupation code to which
> the food checker and table worker would be a part
> of?
>
> A. No.  <u>That would be for those particular
> occupations as well</u>.

Tr. 63 (emphasis added).  In other words, contrary to Plaintiff's

argument, the vocational expert indicated that the numbers

corresponded to the specific occupations to which he testified.

Furthermore, even if the vocational applied the broader SOC

categories, district courts in this Circuit have held that this

methodology is reliable.  <u>See</u>, <u>e.g.</u>, <u>McKinnon v. Comm'r of Soc.

Sec.</u>, 2013 WL 5410696, at *5 (D.N.J. Sept. 26, 2013).

Plaintiff's counsel at the administrative hearing held on

February 26, 2013, objected to the vocational expert testifying

telephonically but when asked by the administrative law judge the

basis for his objection he referenced an incomplete citation to the Code of Federal Regulation and gave no further argument.  Tr. 49. Plaintiff again raises the issue before this court. The record reveals that Plaintiff and his counsel were specifically notified in advance of the hearing that the vocational expert would testify by telephone.  Tr. 364.  Furthermore, HALLEX I-2-3-10 A.2. and I-2-5-30 specifically authorize a vocational expert to testify telephonically.  District courts within this Circuit have also found that telephonic vocational expert testimony is permissible. See, e.g., Lippincott v. Comm'r of Soc. Sec., 982 F.Supp. 2d 358, 379-381 (D.N.J. 2013).

As for Plaintiff's argument that the administrative law judge did not properly consider his credibility, the administrative law judge was not required to accept Plaintiff's claims regarding his physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also

Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801
(10th Cir. 1991)("We defer to the ALJ as trier of fact, the
individual optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge observed
and heard Plaintiff testify as well as his wife, the
administrative law judge is the one best suited to assess their
credibility.

Plaintiff has also argued that the administrative law judge
did not address his work history. This is not correct.  In the
decision issued on January 21, 2011, the administrative law judge
specifically commented on Plaintiff's consistent work history.
Tr. 103.  She stated as follows: "The claimant has a consistent
earnings record, such that it entitles him to some bolstering of
credibility; however, the undersigned finds that the medical
evidence of record, which contained only conservative treatment,
do [sic] not support the nature and extent of his alleged
limitations[]."  Id.  While the administrative law judge did not
discuss Plaintiff's work history specifically in the context of
her credibility finding in the decision issued on March 11, 2013,
she undoubtedly considered Plaintiff's work history in making her
decision because she stated that her decision was rendered
"[a]fter consideration of the entire record" and her first
decision issued on January 21, 2011, was part of that record. The
administrative law judge elicited detailed work history

46

information from Plaintiff and the vocational expert at two administrative hearings.  The transcript of the administrative hearings and the administrative law judge's two decisions clearly reveal that the administrative law judge was cognizant of Plaintiff's 29-year work history.  The administrative law judge admitted into evidence Plaintiff's earnings records and she was aware of his past relevant employment as a heavy equipment operator. The failure to address specifically Plaintiff's work history in the decision of March 11, 2013, in the context of assessing Plaintiff's credibility was harmless error at most under the circumstances of this case.   See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).

The court is satisfied that the administrative law judge appropriately took into account all of Plaintiff's physical limitations established by the medical records in setting Plaintiff's residual functional capacity for the relevant time period.  The administrative law judge concluded that Plaintiff could engage in a limited range of sedentary work.  That conclusion is supported by the opinions of Dr. Myers and Dr. Fuchs.

**CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. As such, the decision of the Commissioner, pursuant to 42 U.S.C. § 405(g), will be affirmed.

An separate Order will be entered.


**DATED:** December 29, 2014

_____
United States District Judge